## Case No. 13,925.

### The THOMAS KILEY.

### [5 Ben. 301.] [1]

### District Court, D. Connecticut. Aug., 1871.

TOWAGE—PERIL OF THE SEA—ANCHOR—EVIDENCE.

1. The steamtug T. K. took in tow three canal-boats, loaded with coal, to tow them from Elizabethport. N. J., to New Haven, Connecticut. The boats were fastened together, and towed by hawsers astern of the tug. In Long Island Sound a high wind was encountered, and the tug and tow hauled in behind Charles Island, where the tug came to anchor, still holding the tow by the hawsers. The wind and sea increased, until the stock of the tug's anchor was broken, and she began to drag. Her captain then called to the canal-boats to throw over their anchors. This was done by the captain of the middle boat. The outside boats had anchors, but they were neither of them ready for use. The anchor of the D. which was on the starboard side. was in her bow cabin, and the only rope she had, which was fit to be used as a cable, had been used to fasten the boats together. The captain of the tug, hearing the anchor of the middle boat let go. dropped the canal-boats astern, by slacking his hawser, to allow that anchor to catch. His own boat, however, continued to drag, and after a vain endeavor to work up to his anchor, the whole tow being in danger of going ashore. he cast off the hawser, and cutting his own cable, went ahead under steam to the mouth of the harbor, where he remained until the storm moderated. Shortly after he cast off the hawser, the D. was found to have grounded. and she filled and sunk, she and her cargo sustaining serious loss. An insurance company which had paid the loss. filed a libel against the tug to recover the damage. *Held*, that the fact that the owner of the D. in settling for former towage services rendered by the owners of this tug, paid bills rendered which had on them the words "At the risk of the master and owners of the boat." was not sufficient to warrant the court in holding that those words formed a part of the towage contract in this case. the contract having been made not by the owner but by the master of the D. and nothing having been said on the subject when the contract was made.

2. The contract. therefore. must be taken to be the ordinary one of towage.

3. A tow-boat. towing under such a contract. is not a common carrier.

4. The breaking of the anchor of the tug was, on the evidence. a peril of the seas.

5. The tug was properly anchored and in a proper place.

6. The D. was not properly equipped for such navigation. in that she had not an anchor ready for use; and that she. and not the tug, was responsible for such negligence.

7. The fact that the captain of the tug cast off his hawser without giving notice to the canal-boats that he was about to do so, was immaterial. because. he had given notice to them to throw out their anchors, and the failure of the D. to do so. cast upon her the burden of the loss.

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

In admiralty.

Charles R. Ingersoll, for libellants.
Robert D. Benedict, for claimants.

SHIPMAN, District Judge. The steamtug Thomas Kiley on the 20th of February, 1870, was engaged in towing the canal-boat D. H. Dygert, from Elizabethport, New Jersey, to New Haven, Connecticut. The Dygert was one of three boats which the tug had in tow. The boats were fastened together and towed by hawsers astern of the tug. When in Long Island Sound a high wind was encountered, and the tug, with her tow, hauled in near Charles Island, the tug coming to anchor and holding her tow astern by the hawsers. While in this situation the wind increased, and the captain of the tug, fearing danger, let go the hawsers, when the canal boats drifted on to the island, and the Dygert grounded and was lost. The libellants, the Home Insurance Co., having become liable for and paid the loss as underwriters, and subrogated to the rights of the insured, instituted this suit against the tug. The gravamen of the charge against the tug is contained in the second article of the libel, and is as follows: "That the said steamboat left the port of New York for the said port of New Haven, with said canal-boat and its said cargo (coal) in tow, on the 19th of February, 1870. and arrived off Charles Island about four o'clock in the afternoon of the 20th, the wind blowing hard; that the said tug or steamboat hauled in by the island with her said tow, holding the same by a hawser astern, and there anchored—that she lay there until almost half past six o'clock, the wind increasing, when the said tug let go the hawser by which her said tow was held, without notice to the tow of her intention so to do, and went out into the sound; that in consequence thereof. the said canal-boat drifted in shore and grounded on Charles Island, where she lay, and pounded on the bottom until she sprung a leak, and in about one hour after she first struck, sank and was totally lost." The third article of the libel adds, "that said loss occurred solely by reason of the negligence and want of care and skill of those in charge of said steamboat, in casting off said hawser and leaving said canal-boat. and in not returning to rescue her from the dangerous position into which she had drifted on being left by said steamboat."

The answer of the owner of the tug admits entering upon the towage service, but alleges that, by the terms of the agreement between them and the master and agent of the Dygert, the latter was to be towed at the risk of her owners. He admits, also, hauling in under Charles Island, and letting go the hawser, and the drifting ashore of the Dygert, and her loss. The answer denies that those in charge of the tug were guilty of any negligence, want of care or skill. and alleges the cause of the loss to have been as follows, viz: "After the said steamboat and her tow had been at anchor for about two hours, the wind, which had been increasing, rose to a gale, and blew so heavily that by the force of the wind and the sea, the stock of the anchor which held the steamboat was broken, and the anchor began to drag, and there was danger that said steamboat and her tow might drag on shore. That orders were thereupon given to the canal-boats in tow, to put out their anchors. That only one of said boats was able to put out any anchor, and that the Dygert was not able to put out any anchor, because she had neither cable nor chain that she could use for that purpose. That one of said canal-boats, however, did put out an anchor. That said steamboat then started her engine, so as, if possible, to work up to her anchor, and find out what was the cause of its dragging, but was unable to do so with the tow hanging on astern, in consequence of the violence of the wind and sea, and was compelled to let go the hawser to save herself from going on shore, supposing that the canal-boats were safely anchored, but was still unable to raise her anchor, owing to the violence of the sea, and was compelled to slip her cable and steam against the wind in the mouth of the harbor until the violence of the storm had somewhat moderated, when she returned to the tow and found the Dygert grounded and full of water. And he alleges that the loss was occasioned, so far as the action of the steamboat was concerned, by a peril of the seas, for which he is not responsible, and as far as concerns the canal-boat, by the fault and negligence of her master and owners in not having her well equipped so that she could anchor."

As to the allegation in the answer, that the master and agent of the Dygert agreed that she was to be towed at the risk of her owner, I do not find it proved. The only evidence, in support of that allegation of the answer is the statement of one of the witnesses in his testimony, that the owner of the Dygert had, in settling for former towage services, rendered by the owners of the tug, paid bills rendered which had on them the words, "At the risk of the master and owners of the boat or vessel towed." From this fact the court is asked to infer that these words formed part of the contract in the present case. This claim is inadmissible. There is no proof that this subject was in any manner referred to at the time this contract was made. The contract was not made by the owner of the Dygert, but by her master and agent, Elliot, who appears to have simply gone to the office of the owner of the tug in New York and engaged a steamer to tow his boat. There is no proof that he knew anything about the clause referred to as having been in bills paid by the owner of his boat. The contract must therefore be taken to be the ordinary one of towage, subject to the usual obligations imposed by law upon tugs and tows under similar circumstances.

The facts of this case are very simple.

The tug had the Dygert and two other canal-boats in tow. The latter were lashed together, side by side, the Dygert being the starboard boat. They were towed astern of the tug by hawsers running from her to each of the outside boats. When near Charles Island the wind had increased to a degree that rendered it prudent to find a shelter. The tug hauled in under Charles Island, the most convenient, and so far as the evidence shows, the only feasible harbor. The captain of the tug anchored, holding his tow by the hawsers. They all lay comfortably till after six o'clock, when the wind increased and produced a heavy sea. The captain of the tug then found his anchor dragging, and hailed the canal-boats and told them to throw out their anchors. The anchor of the middle boat, the Curtis, was all ready and was immediately thrown over. The anchor of the Dygert was not ready. It was in the bow cabin, and the only line which could be used as a cable was then in use for fastening the Dygert to the Curtis, the middle boat. The anchor of the other outside boat was in her stable, with no cable to it.

When the captain of the tug got an answer to his hail, and heard the anchor of the Curtis go and the chain run out, he slacked away on his own cable, so that the canal-boats might fetch up on their anchors, and thus take some of the strain off from his. But his own anchor continued to drag. He then tried to work up to his anchor, towing the whole fleet, but could not, as his boat fell off broadside to the wind, and was in danger of going ashore, taking the canal-boats with her. He then slipped his hawsers and endeavored to work up to his anchor, but the sea ran so high that his men could not stand forward, and he slipped his cable. He then kept the head of his tug to wind, working her slowly, and subsequently went in his life-boat to take off the women on the canal-boats, and found the Dygert aground.

The charge of negligence against the captain of the tug is, that he slipped his hawsers, and thus left the canal-boats to drift ashore. But before he did this, he found his anchor dragging, and ordered the canal-boats to put over theirs. He supposed they had done so. The Curtis had, and had the anchors of the other boats been ready, they would have doubtless been thown out too. Soon after the Curtis's anchor was thrown over, those on the canal-boats discovered that the hawsers that had held them to the tug were no longer taut, but hanging over their bows, and the steamer gone. They then went to work hauling in the hawsers, and using them to fasten the Dygert to the other boats, so as to release her line, in order to use that as a cable to her anchor. Before they had completed this, they found that the Dygert had grounded.

According to the testimony of the captain of the Dygert, half an hour elapsed from the time the steamer disappeared in the darkness before his boat grounded. It must have been considerably more than that from the time the captain of the tug ordered the canal-boats to throw out their anchors to the time when the Dygert first struck. When this order was given, it was accompanied with the statement that the steamer was dragging her anchor. This the captain of the Curtis says he heard, though he says that when the steamer finally slipped her hawsers she gave no notice that such an act was contemplated. During all this time the wind blew a gale, and the sea ran high. Peril was apparent and obvious. Every consideration pressed on those on the canal-boats to use every effort to anchor their boats, as the steamer's anchor had failed to hold. But the trouble was, but one of the canal-boats had any anchor in a condition to use promptly, and that was insufficient to hold the three. Half an hour at least elapsed from the time they were notified of the danger (which ought to have been apparent), and the Curtis's anchor was thrown out, before the Dygert grounded. Had the latter been in a condition to have cast her anchor as promptly as the Curtis did, she might have been saved.

The proof is that the anchor of the tug was of a weight and character adapted to the boat and the business in which she was engaged. The violence of the wind and sea subjected it to an enormous strain, which broke the stock, and thus prevented its holding. So far as that accident is concerned, it is properly attributable to a peril of the seas.

The Dygert was not properly equipped. The navigation of Long Island Sound is often rough and dangerous, especially at the season of the year when this accident occurred. To attempt the passage in a canal-boat loaded with coal, and little more manageable in a high wind than a log, without an anchor ready for use, is gross negligence, unless the law exempts such a boat, when in tow, from this precaution, and throws the whole responsibility on the tug.

The extent of the responsibilities which a tug-boat assumes in regard to the boats she takes in tow has been the subject of considerable discussion in the text books and by judges. An examination of the decided cases has disclosed conflicting opinions. As early as 1835, the supreme court of New York held that the owners of a steamboat who undertook to tow a freight boat for hire, were bound only to the exercise of ordinary care and skill, and that they were not, quoad hoc, common carriers. Caton v. Rumney, 13 Wend. 387. Substantially the same doctrine was laid down in Alexander v. Greene, 3 Hill, 1. In this latter case the steamer was a regular tow-boat, and held herself out as such. The counsel for the tow endeavored to found a distinction on this circumstance, and thus distinguish the case from that of Caton v. Rumney. But

the court refused to recognize the distinction as a valid one, and held, that though the defendants were engaged in the business of towing boats laden with merchandise, yet they were not common carriers. That case went to the court of errors, and was reversed, but not on this point. What the views of a majority of the court were on this question does not appear. 7 Hill, 533; 2 Const. [2 N. Y.] 204. In the case last cited (2 Const. [2 N. Y.] 204), the doctrine that tug-boats are not common carriers was affirmed. In Vanderslice v. The Superior [Case No. 16,843], Kane, U. S. district judge, expresses dissatisfaction with the doctrine of Alexander v. Greene, and urges some reasons why, in his judgment, tow-boats should be either held as common carriers, or form a distinct and new class of bailees for hire, with peculiar obligations and responsibilities. But when that case came before the circuit court, Grier, J., refused to assent to the doctrine that such boats were common carriers. 1 Pars. Mar. Law (1st Ed.) 176. The state courts of Pennsylvania have repeatedly held that tow-boats were not common carriers. Leonard v. Hendrickson, 18 Pa. St. 40; Hays v. Paul, 51 Pa. St. 134; Brown v. Clegg, 63 Pa. St. 51.

In Louisiana and North Carolina a different doctrine has been held. Smith v. Pierce, 1 La. 129; Walston v. Myers, 5 Jones (N. C.) 174.

I have examined all the authorities on this point which a somewhat diligent search has brought to light, and I am satisfied that the weight, both of authority and reason, is against the doctrine that tow-boats are common carriers. The true principles applicable to such contracts are well stated by Lord Kingsdown, in speaking for the privy council in the case of The Julia. "When the contract was made, the law would imply an engagement that each vessel would perform its duty in completing it; that proper skill and diligence would be used on board of each; and that neither vessel, by neglect or misconduct, would create unnecessary risk to the other, or increase any risk which might be incidental to the service undertaken. If, in the course of the performance of this contract, any inevitable accident happened to one, without any default on the part of the other, no cause of action would arise. Such an accident would be one of the risks of the engagement to which each party was subject, and would create no liability on the part of the other. If, on the other hand, the wrongful act of either occasioned damage to the other, such wrongful act would create a responsibility on the party committing it. * * * These are plain rules of law by which their lordships think that the case is to be governed." The Julia, 1 Lush. 224, 231.

In the case before us no fault in the selection of the harbor, or shelter, of Charles Island by the tug, is alleged or proved. Nor is any fault alleged or proved as to the manner or position in which the tug placed her tow when she came to anchor. The witnesses for the libellant distinctly say that they all lay comfortably for two hours after the tug came to anchor, and till the wind had increased to great violence, and the anchor of the tug began to drag in consequence of the breaking of the stock. The tow was then notified to throw over their anchors. It is true, that the captain of the tug, when he first anchored, in reply to a question from the tow, said he thought his anchor would hold them. But this formed no excuse for the negligence of the Dygert in having no anchor in a condition to use, should occasion subsequently demand it. The storm was as apparent to those on the tow as to the captain of the tug. The necessity of having the anchor ready, in case the captain of the tug should deem it necessary to use it, was obvious to the captain of the Dygert, and it was his duty to have it in readiness in case an emergency should arise. Indeed, it was an obvious precaution which should have been provided by the Dygert before the voyage commenced. The suggestion made on the argument, that it was the duty of the captain of the tug to see that the anchor of the canal-boat was ready and equipped for use, is inadmissible. He had a right to rely on the necessary and proper equipment of the Dygert for such a voyage, and her ability and readiness to obey his orders, and put forth such practicable and ordinary efforts as might become necessary for her safety in rough weather. But it is suggested that the captain of the tug selected an improper place to anchor, one which allowed the tow to swing too near in shore while the canal-boats were held by the steamer. But, as already intimated, the proofs of the libellants do not bear out this claim. The Dygert did not ground till long after the steamer came to anchor, nor till half an hour after the wind and sea became still more violent, and the tug began to drag. Then her captain immediately ordered the canal-boats to throw over their anchors. The Curtis did so, but neither of the other boats had an anchor ready for use, and after the lapse of half an hour the Dygert struck.

It is impossible to resist the conclusion that the anchor of the Curtis being too light to hold the three boats, they dragged, and thus got into shallow water, where the Dygert grounded, and, in consequence, was lost.

It is said, however, that the captain of the tug cast off his hawser without giving notice to the tow. This is immaterial. He had given notice to the latter to throw over their anchors; his reasons for that order it was not necessary to communicate to the canal-boats. It was apparent to all that there was danger, and the canal-boats should have been in a condition to have performed their duty in attempting to avert it. The Curtis was in that condition, and promptly did her duty. The Dygert was not, and cannot now

be permitted to saddle her loss on the tug, in the absence of any fault on the part of the latter.

Let the libel be dismissed. with costs.